Miles D. Grant, Esq.           (SBN  89766)
Alexander J. Kessler, Esq.     (SBN 278240)
Phillip A. Zunshine, Esq.      (SBN 339010)
**GRANT & KESSLER, APC**
1331 India Street
San Diego, CA 92101
Tel: 619-233-7078; Fax: 619-233-7036
miles@grantandkessler.com; aj@grantandkessler.com;
phillip@grantandkessler.com

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| TERRI H. LEVENSON,<br><br>            Plaintiff,<br>v.<br><br>JOSEPH S. SAPP; SHELLIE KRETZSCHMAR; SAS318 LLC; MURRIETA DEVELOPMENT CLJS LLC; MURRIETA DEVELOPMENT II LLC,<br><br>            Defendants. | CASE NO.<br><br>**COMPLAINT FOR RECOVERY OF DAMAGES UNDER RICO (18 U.S.C. § 1961, ET SEQ.), DECLARATORY RELIEF TO ESTABLISH ALTER EGO LIABILITY, SET ASIDE FRAUDULENT CONVEYANCES, CREDITOR'S CLAIM, AND ESTABLISH LIABILITY ON THE JUDGMENT AND DEMAND FOR JURY TRIAL** |

Plaintiff alleges:

## PRELIMINARY ALLEGATIONS

*A.  Jurisdiction and Venue*

1.  Federal District Court Jurisdiction exists in this action pursuant to 28 U.S.C. § 1331 because this is an action arising under a federal statue, the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq.

2.  Jurisdiction is also proper in this Court pursuant to 28 U.S.C. § 1332(a)(2), because Plaintiff is a citizen of the State of Arizona and Defendants are each citizens of the State of California, thus creating diversity of citizenship.

Plaintiff's damages, exclusive of interest and costs, is in excess of $75,000.

3. Venue is proper in this judicial district under 28 U.S.C. § 1391 in that this is the judicial district in which all of the Defendants reside and have their principal place of business.

**B. The Parties**

4. Plaintiff is a resident of the State of Arizona.

5. Defendant JOSEPH S. SAPP ("Joe") is a resident of City of Murrieta ("Murrieta"), Riverside County, California.

6. Defendant SHELLIE KRETZSCHMAR ("Shellie") is a resident of Murrieta.

7. At all times herein mentioned Joe and Shellie have lived together and, although not legally married, have held themselves out to the world as husband and wife.

8. Defendant SAS318 LLC ("SAS") is a California limited liability company with its principal place of business in Murrieta.

9. Plaintiff believes Defendant MURRIETA DEVELOPMENT CLJS LLC ("CLJS") is a California limited liability company with its principal place of business in Murrieta.

10. Plaintiff believes Defendant MURRIETA DEVELOPMENT II LLC ("MDII") is a California limited liability company with its principal place of business in Murrieta.

**C. Plaintiff's Judgment**

11. Joe and Plaintiff were married from December 1978 until April 15, 2003, when they obtained a Judgment for Dissolution of Marriage in the California Superior Court, San Diego County, Case No. D473144 ("Family Action"). Joe and Plaintiff signed a Stipulation and Order filed in the Family Action on September 1, 2005, a copy of which is attached as **Exhibit 1**, providing for Joe to pay Plaintiff monthly spousal support of $12,000 ("Support Order")

-2-

COMPLAINT

continuing until the death of Joe or Plaintiff.

12. The Support Order has never been modified and remains in effect.

13. Joe has paid virtually nothing on the Support Order for 15 years.

14. As of the date of filing this Complaint, Joe owes Plaintiff over $3.9 million on the Support Order including principal of $2,244,000 and interest of over $1,671,000 at the California legal rate of interest of 10% from the date each payment was due (the full amount owed by Joe to Plaintiff is hereinafter referred to as the "Support Obligation").

### D. *The Fraudulent Scheme*

15. For over eight years, Joe and Shellie have held themselves out as husband and wife. They post pictures on Facebook and other social media platforms claiming to be husband and wife. They have lived continuously together acting as husband and wife. Plaintiff believes and alleges the sole reason Joe and Shellie never legally married is for Shellie to assist Joe in hiding his income and assets from Plaintiff.

16. Commencing at least eight years ago, Joe and Shellie devised a scheme for Joe to form business entities owned by Shellie, developing real estate with all revenues and benefits going to Shellie even though Joe alone did all of the work and Shellie had no knowledge or involvement of real estate deals.

17. As part of the fraudulent scheme, Shellie and Joe formed SAS, owned 100% by Shellie, which became a partner in many real estate deals, some making a lot of money, with Joe doing all of the work and Shellie doing none of the work. In spite of working, likely full time, Joe never received a penny in income, revenues or profits. Rather all went to SAS and Shellie who in turn 100% supported Joe and paid for all of Joe's living expenses.

///

///

///

-3-

COMPLAINT

*E.  Predicate Acts Establishing RICO Claims*

18. All of the below actions involve interstate commerce as the fraudulent scheme was designed to hide the income and assets of Joe, a California resident, from Plaintiff, an Arizona resident, to prevent Plaintiff from collecting on the Support Obligation.  Further, as explained below, Joe and Shellie used several out-of-state entities to perpetrate their scheme.

**2015 Scheme - Downtown SD Project**

19. In 2012, Joe, through his entity Kristie, Inc (a Wyoming corporation), entered into a Pre-Development Services Agreement with Miland-Kristie, LLC ("MKL") to work as a consultant to entitle property owned by MKL in Downtown San Diego.

20. On August 5, 2015, Joe wrote an email to Bruno Salvadori ("Bruno"), a representative of MKL, to wire money owed to Joe to an account in the name of Cleopatras Home Care, which Joe admitted was one of Shellie's entities.  Later the same day, Joe wrote an email to Bruno clarifying that the account was actually in Shellie's name as it had not yet been converted to Cleopatra's name.

21. On August 14, 2015, Joe emailed Bruno and others to pay Shellie.

22. On October 16, 2015, Joe emailed Bruno asking that he wire Shellie the next amount of money owed to Joe.

23. ***The above actions constitute wire fraud***.  Joe used email to perpetrate the fraud by directing Bruno and others at MKL to pay Shellie and her entities instead of Joe for work done solely by Joe.

24. ***The above facts constitute a pattern of racketeering*** activity because Joe did this several times.  Further, the racketeering activity involves interstate commerce because Joe was working through Kristie, Inc, a Wyoming entity.

/ / /

/ / /

/ / /

**2018 Scheme - The Ranch Project**

25. In 2017, 17th Street Investors SD, LLC changed its name to Murrieta Development CLJS, LLC ("CLJS"). The amended operating agreement for CLJS states that it has two members: (a) PGP Holdings RL, LLC ("PGP"), a Delaware entity owned by Chris LaFornara ("Chris") which owns 60% of CLJS; and (b) SAS, an entity owned solely by Shellie which owns 40% of CLJS. The operating agreement specifically provides that Joe ***shall*** use his expertise and skill in completing entitlements on certain projects, in spite of the fact that Joe was not an owner or employee of CLJS or SAS and received no compensation, profits or benefits from either.

26. On January 26, 2018, CLJS purchased property at 41529 Ivy St., Murrieta which commonly was referred to as the Ranch Project, for $1,687,500. Joe then entitled the property and it was sold, on July 12, 2018, for about $7.5 million. Joe did all of the entitlement work on the project. Joe signed all of the loan documents on behalf of CLJS for financing the property. **Joe personally guaranteed the loan**. Shellie did not.

27. ***The above actions constitute wire and/or mail fraud:*** (a) by forming SAS and CLJS in the manner done, Joe and Shellie worked together to ensure that SAS, and not Joe, would be entitled to 40% of any profits from the sale of the Ranch Project. And any profits would only result if Joe were able to successfully entitle the property; (b) the CLJS operating agreement was delivered to the lender EMPAC Mortgage to obtain financing on the Ranch Project; and (c) the buyer of the Ranch Project was directed to pay CLJS, which fraudulently listed SAS as a 40% owner.

28. This conduct also involves interstate commerce because Chris was part of the scheme through his Delaware entity, PGP, which was listed as a 60% owner of CLJS on the operating agreement.

///

**2020 Scheme - The Sapphire Murrieta Project**

29. After the Ranch Project sold, Shellie testified that she rolled all of her profits into a property on McElwain and Linnel in Murrieta known as the Sapphire Murrieta Project which was purchased by Defendant MDII, which is owned 100% by CLJS.

30. After MDII acquired the Sapphire Murrieta Project, Joe began the entitlement work. To fund the entitlements, MDII obtained an entitlement loan (same as a construction loan) from EP Guardian Fund ("EP"). Once a month, Joe, on behalf of MDII, would submit a draw request to EP detailing out all of the last month's expenses. EP would review each request and pay MDII if it approved the expenses.

31. As part of the initial budgeting for the project, Joe negotiated with EP that SAS would be entitled to a $25,000 monthly "management fee" for overseeing the entitlement work. EP understood that this was meant as compensation for Joe's entitlement work, as Joe was the only one working to obtain the entitlements. However, instead of having the $25,000 monthly fee paid to Joe for his work, Defendants worked together to make sure that the monthly fee was paid to SAS, Shellie's entity.

***The above actions constitute wire and/or mail fraud,*** as Joe would submit a monthly request by email to EP to pay a management fee to SAS (not to Joe). Because this happened once a month, there is a pattern of racketeering activity. Further, this also involves interstate commerce because of CLJS' involvement, where PGP, a Delaware entity, owned 60%.

**SAS uses the money to pay for Joe**

32. In the Family Action, Shellie and Joe have testified at trial, depositions and through declarations that Shellie 100% financially supports Joe. She pays for anything he needs. Joe has no other source of income other than what Shellie gives him or pays for him. Shellie even gave Joe a debit card that he could use as

he pleased.

33.  SAS, Shellie's entity, earned $25,000 per month for work on the Sapphire Murrieta Project.  The total amount of draws that SAS received was $450,000.  All of this money went from SAS, to Shellie, and then for Joe's benefit—all without a penny being paid to Joe directly so that Plaintiff would never be able to collect any of it on the Support Obligation.

### F.  *Alter Ego Allegations re SAS & MDII*

34.  Plaintiff believes and alleges that at all times herein mentioned there existed a unity of interest between Joe and SAS and MDII such that any individuality and separateness between them had ceased and SAS and MDII are each the alter ego of Joe and each is jointly and severally liable with Joe for all sums owed Plaintiff.

35.  Adherence to the fiction of the separate existence of SAS and MDII as entities distinct from Joe would permit an abuse of the corporate and LLC privilege and promote injustice because, Plaintiff believes and alleges:

(a) Joe, on behalf of MDII and SAS, obtained an entitlement loan with EP to entitle the Sapphire Murrieta Project.  Joe admits he was in charge of obtaining the entitlements on the Sapphire Murrieta Project.  Joe negotiated with EP for his $25,000 monthly management fee to be paid to SAS, instead of to himself;

(b) Joe, on behalf of MDII and SAS, found the opportunity to develop the Sapphire Murrieta Project, negotiated the sale, found the lender (EP), and negotiated the loan to purchase the property;

(c) Joe, on behalf of MDII and SAS, worked with dozens of agencies and service providers, including obtaining traffic impact analysis, various surveys, environmental reports, and more.  Joe's name is on every report.  Joe attended every required meeting with various governmental agencies.

/ / /

-7-

(d) Once a month, Joe emailed a draw request to EP for all bills that SAS and MDII needed to pay towards entitling the Sapphire Murrieta Project;

(e) Joe has admitted that all of SAS' earnings for his entitlement work on the Sapphire Murrieta Project, roughly $450,000, was paid to SAS, then to Shellie, and that Shellie in turn paid for all of Joe's living expenses;

(f) Joe dominated and controlled SAS and MDII to such an extent that he controlled all of SAS and MDII's assets, revenues, and expenses;

(g) Joe formed and used SAS and MDII as vehicles and devices to hide Joe's assets and income to avoid payment of the Support Obligation to Plaintiff;

(h) Joe directed and controlled all matters involving SAS and MDII, made all decisions about them, and operated SAS and MDII as if it was Joe's business and personal assets;

(I) Joe maintained and controlled all of the revenues of SAS and MDII and made all decisions about the use of those revenues;

(j) Joe determined the obligations and expenses of SAS and MDII, the business operations of SAS and MDII and used SAS and MDII as his businesses to accomplish Joe's personal goals and needs, to avoid paying the Support Obligation;

(k) Joe has dominated and controlled SAS and MDII to such an extent that he treats the assets of SAS and MDII the same as if directly owned by Joe.

36. Plaintiff believes that the sole or primary purpose of the existence of SAS and MDII was for Joe to not have assets or income in his name, rather to put his assets in the names of SAS and MDII, so Plaintiff would have no ability to reach Joe's assets or satisfy the Support Obligation meaning, Shellie and Joe perpetrated a fraud on Plaintiff, for the sole purpose of hiding Joe's assets and income so that Plaintiff had no way to recover on the Support Obligation.

/ / /

37. Based on everything done by Joe, SAS and MDII are each Joe's alter ego, and each should be jointly and severally liable with Joe on the Support Obligation.

### G. *Alter Ego Allegations re Shellie*

38. Plaintiff believes and alleges that at all times herein mentioned there existed a unity of interest and ownership between Shellie and SAS and MDII to such an extent that any individuality and separateness between them had ceased and Shellie is the alter ego of SAS and MDII and, as such, is jointly liable (as each entity is Joe's alter ego) for the Support Obligation owed Plaintiff.

39. Adherence to the fiction of the separate existence of SAS and MDII as entities distinct from Shellie would permit an abuse of the corporate and LLC privilege and promote injustice because, Plaintiff believes and alleges:

(a) Shellie authorized, agreed and allowed Joe to dominate and control SAS to such an extent that Joe controlled all of SAS and MDII's assets, revenues, and expenses;

(b) Shellie was the sole owner of SAS and MDII which was formed by Joe, with the consent and knowledge of Shellie, to serve as a vehicle and device to hide Joe's assets and income to avoid payment of the Support Obligation to Plaintiff;

(c) Shellie agreed, willingly participated and allowed Joe to direct and control all matters involving SAS and MDII, make all decisions about SAS and MDII, and operate SAS and MDII as if each was Joe's business and personal assets;

(d) Shellie agreed, willingly participated and allowed Joe to maintain and control all of the revenues of SAS and MDII and make all decisions about the use of those revenues;

(e) Shellie and Joe perpetrated a fraud on Plaintiff, for the sole purpose of hiding Joe's assets and income so that Plaintiff had no way to recover

-9-

on the Support Obligation; and

(f) Shellie used all of SAS' income generated by Joe's entitlement work to pay for Joe's living expenses—directly ensuring that Joe would never have any assets or income that Plaintiff could reach to satisfy the Support Obligation.

40. Plaintiff believes that the sole or primary purpose of the existence of SAS and MDII was for Joe to not have assets or income in his name, rather to put them in the name of SAS and MDII, so Plaintiff would have no ability to reach Joe's assets or otherwise satisfy the Support Obligation meaning, Shellie and Joe perpetrated a fraud on Plaintiff, for the sole purpose of hiding Joe's assets and income so that Plaintiff had no way to recover on the Support Obligation.

41. Based on everything done by Shellie, she is the alter ego of SAS and MDII, and should be jointly and severally liable with SAS and MDII, which are the alter ego of Joe, on the Support Obligation.

## FIRST CLAIM FOR RELIEF
## [RICO Liability Against All Defendants]

42. Plaintiff re-alleges and incorporates by this reference paragraphs 1-41 of the Preliminary Allegations.

43. Defendants, and each of them, in doing the things alleged above have engaged in an enterprise affecting interstate commerce through a pattern of racketeering activity, including mail fraud and wire fraud, consisting of a series of wires and other transactions, done over the course of more than 10 years on numerous projects, all done for the purpose of avoiding Joe having any income or assets in his name to satisfy the Support Obligation. This activity has affected interstate commerce because the fraudulent scheme was designed by California residents, Joe and Shellie, to perpetrate a fraud against Plaintiff, an Arizona resident. Further, PGP, a DE LLC is a 60% owner of CLJS, the entity involved in the transactions. Plaintiffs believe that each of the Defendants have conspired to

COMPLAINT

engage in the pattern of racketeering activity to enable Joe to avoid paying the Support Obligation to Plaintiff, all in violation of 18 U.S.C. §§ 1961 and 1962(b), (c) and (d).

44. Pursuant to 18 U.S.C. § 1964(c), Plaintiff is entitled to treble damages, three times the amount owed for the Support Obligation, together with her legal fees herein incurred.

## SECOND CLAIM FOR RELIEF

**[Declaratory Relief - SAS and MDII are each the alter ego of Joe]**

45. Plaintiff re-alleges and incorporates by this reference paragraphs 1-41 of the Preliminary Allegations and paragraphs 42-44 of the First Claim for Relief.

46. An actual controversy has arisen and now exists between Plaintiff and SAS, MDII and Joe concerning whether SAS and MDII are each the alter ego of Joe and, as such, are each jointly liable with Joe on the Support Obligation.

47. Plaintiff desires a judicial determination of her rights and a determination that SAS and MDII are each the alter ego of Joe and, as such, are directly liable to Plaintiff for the Support Obligation.

48. A judicial determination is necessary and appropriate at this time so Plaintiff may ascertain her rights against SAS and MDII in trying to collect the Support Obligation. Further, as set forth in *Lopez v Escamilla* (2020) 48 Cal.App.5th 763, filing a separate lawsuit to establish alter ego liability on a judgment is appropriate.

## THIRD CLAIM FOR RELIEF

**[Declaratory Relief - Shellie is the alter ego of SAS and MDII]**

49. Plaintiff re-alleges and incorporates by this reference paragraphs 1-41 of the Preliminary Allegations, 42-44 of the First Claim for Relief, and 45-48 of the Second Claim for Relief.

///
///

-11-

COMPLAINT

50. An actual controversy has arisen and now exists between Plaintiff, SAS, MDII and Shellie concerning whether Shellie is the alter ego of SAS and MDII and, as such, is jointly liable with SAS and MDII, which is the alter ego of Joe, on the Support Obligation.

51. Plaintiff desires a judicial determination of her rights and a determination that Shellie is the alter ego of SAS and MDII, and, as such, is directly liable to Plaintiff for the Support Obligation.

52. A judicial determination is necessary and appropriate at this time so Plaintiff may ascertain her rights against Shellie in trying to collect the Support Obligation. Further, as set forth in *Lopez v Escamilla* (2020) 48 Cal.App.5th 763, filing a separate lawsuit to establish alter ego liability on a judgment is appropriate.

## FOURTH CLAIM FOR RELIEF

**[Set Aside Fraudulent Conveyances Against Shellie, SAS, and MDII - CA Civil Code § 3439.04(a)(1)]**

53. Plaintiff re-alleges and incorporates by this reference paragraphs 1-41 of the Preliminary Allegations, 42-44 of the First Claim for Relief, 45-48 of the Second Claim for Relief, and 49-52 of the Third Claim for Relief.

54. Periodically and continuously for the past seven years, Shellie, SAS and MDII have transferred all of their revenues, profits and income to each other ("Revenue Transfer") to avoid any of the revenues or assets to be in the name of Joe. At the time of each Revenue Transfer [as provided for in California Civil Code § 3439.04(a)]:

    (a) Shellie, SAS and MDII made the decision to make each transfer;

    (b) Shellie, SAS and MDII were insiders in that they handled, controlled and took possession of all of the revenues of each other;

    (c) Shellie, SAS and MDII had possession and control of each transfer after it was made;

   (d) All of the transfers were made while Joe owed the Support Obligation to Plaintiff;

   (e) As a result of each transfer, Joe had no assets or income and Plaintiff had no ability to recover on the Support Obligation.

  55. Plaintiff believes and alleges that at the time of each Revenue Transfer, Joe owed the Support Obligation to Plaintiff and each Revenue Transfer was made with the actual intent to hinder, delay, or defraud the creditors of Joe, particularly Plaintiff, in violation of Civil Code § 3439.04(a)(1).

  56. Plaintiff seeks to set aside each Revenue Transfer to the extent necessary so the Support Obligation is paid in full.

  57. Plaintiff has been generally damaged as a result of the wrongful actions of Shellie, MDII and SAS which was masterminded by Joe and Shellie. Accordingly, Plaintiff is entitled to recover from Shellie, MDII and SAS all of the Revenue Transfers up to the total amount owed on the Support Obligation.

  58. Shellie and Joe did the things herein alleged maliciously and to oppress the creditors of Joe, particularly Plaintiff. Plaintiff is therefore entitled to punitive damages in a sum subject to proof at the time of trial.

  59. As the alter ego of SAS, Shellie is jointly and severally liable for all sums which Joe and SAS owe Plaintiff on the Support Obligation.

  60. Plaintiff discovered the fraudulent transfers within one year of the filing of this complaint, while conducting discovery in the Family Action. Plaintiff could not reasonably have discovered the transfers sooner. Accordingly, this action was filed within one year of reasonable discovery by Plaintiff of the fraudulent transfers consistent with Civil Code § 3439.09(a).

/ / /

/ / /

/ / /

## FIFTH CLAIM FOR RELIEF

**[Creditor's Action Against Shellie, MDII, and SAS - CA Code of Civil Procedure § 708.210]**

61. Plaintiff re-alleges and incorporates by this reference paragraphs 1-41 of the Preliminary Allegations, 42-44 of the First Claim for Relief, 45-48 of the Second Claim for Relief, 49-52 of the Third Claim for Relief, and 53-60 of the Fourth Claim for Relief.

62. Plaintiff believes Shellie, MDII and SAS have possession and/or control of assets, funds, revenues, profits and money in which Joe has or should have an interest. Pursuant to California Code of Civil Procedure §§ 708.250 and 708.280, Plaintiff is entitled to an adjudication and judgment, including a turnover of all funds and assets which Shellie, MDII and SAS are holding or were holding in which Joe has or should have an interest up to the total amount owed on the Support Obligation.

## SIXTH CLAIM FOR RELIEF

**[Liability on the Support Obligation Against Shellie, SAS, and MDII]**

63. Plaintiff re-alleges and incorporates by this reference paragraphs 1-41 of the Preliminary Allegations, 42-44 of the First Claim for Relief, 45-48 of the Second Claim for Relief, 49-52 of the Third Claim for Relief, 53-60 of the Fourth Claim for Relief, and 61-62 of the Fifth Claim for Relief.

64. Based on SAS and MDII being the alter ego of Joe, based on Shellie being alter ego of SAS and MDII, and based on the fraud and other wrongful conduct of said defendants, as described above, Shellie, SAS, and MDII are and must be held to be jointly liable for the full amount owed on the Support Obligation.

65. Further, as set forth in *Lopez v Escamilla* (2020) 48 Cal.App.5th 763, filing a separate lawsuit to establish alter ego liability on a judgment is appropriate.

**WHEREFORE,** Plaintiff prays judgment against Defendants as follows:

A. In the First Claim for Relief, that based on the racketeering activities of Defendants, Shellie, SAS, MDII, and CLJS are personally and/or jointly liable on the Support Obligation;

B. In the First Claim for Relief, that the total damages, the amount owed on the Support Obligation, be trebled;

C. In the First Claim for Relief, for reasonable attorney fees herein incurred;

D. In the Second Claim for Relief, for a determination that SAS and MDII are the alter ego of Joe and, as such, are jointly and severally liable with Joe for the full amount owed on the Support Obligation;

E. In the Third Claim for Relief, for a determination that Shellie is the alter ego of SAS and MDII, which are the alter egos of Joe and, as such, is jointly and severally liable with Joe for the full amount owed on the Support Obligation;

F. In the Fourth Claim for Relief, that each and every one of the Revenue Transfers was a fraudulent conveyance and must be set aside and the funds returned to Joe up to the amount necessary to pay in full the Support Obligation;

G. In the Fourth Claim for Relief, for punitive damages against Joe and Shellie in a sum subject to proof at the time of trial;

H. In the Fifth Claim for Relief, that all money and assets now or previously held by Shellie, MDII and SAS for the benefit of Joe, or in which Joe had an interest or should have had an interest, be ordered as a judgment and returned to Plaintiff to satisfy the Support Obligation;

I. In the Sixth Claim for Relief, that Shellie, SAS, and MDII be directly liable for the Support Obligation based on each of them being the alter ego of Joe and each other and based on the fraud and other wrongful conduct committed by each of them;

///

-15-

1        J.    For costs of suit herein incurred and such other relief as this Court deems proper.

DATED: February 17, 2023          GRANT & KESSLER, APC

                                         By: */s/ Phillip A. Zunshine*
                                               Phillip A. Zunshine
                                               Attorneys for Plaintiff

I:\DOCS\12-130\Z-RICO\A-Master\Pleadings\Complaint-01c.wpd